UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN BUILDING AND
CONSTRUCTION TRADES COUNCIL,          CASE NUMBER: 11-13520
AFL-CIO, and GENESEE, LAPEER,
SHIAWASSEE BUILDING AND               HONORABLE VICTORIA A. ROBERTS
CONSTRUCTION TRADES COUNCIL,
AFL-CIO,

                Plaintiffs,

v.

RICHARD SNYDER, Governor of the State of
Michigan, in his official capacity,

                Defendant.

_____/

**ORDER GRANTING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Before the Court is a challenge to the "Michigan Fair and Open Competition in

Governmental Construction Act," 2011 Mich. Pub. Acts 98, M.C.L. § 408.871, *et seq.*

(the "Act").  On October 21, 2011, Michigan Governor Richard Snyder ("Defendant")

filed a motion to dismiss the Amended Complaint, asserting that Plaintiffs lack standing

to challenge the Act, and that the Act does not violate federal rights.

On January 4, 2012, the Court held a hearing on Governor Snyder's motion to

dismiss.  At the hearing, both sides agreed that the Court could render a decision on the

merits, and that there was no need for discovery.  Further, both parties agreed there

1

were no factual disputes that needed to be resolved.  With the consent of the parties, the Court entered an order that same day converting the motion to dismiss into cross-motions for summary judgment under Fed. R. Civ. P. 56.

The parties filed supplemental briefs in support of summary judgment.  Prior briefing in connection with Governor Snyder's motion to dismiss was incorporated. The matter is fully briefed and ready for a decision on the merits.

The Court finds that there is no genuine issue of material fact; judgment should enter in favor of Plaintiffs as a matter of law.  Plaintiffs' motion for summary judgment is **GRANTED**.  Defendant's motion for summary judgment is **DENIED**.

## II.   BACKGROUND

Michigan Building and Construction Trades Council, AFL-CIO, and Genesee, Lapeer, Shiawassee Building and Construction Trades Council, AFL-CIO (collectively "Plaintiffs"), brought suit against Defendant under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.  Plaintiffs seek a declaratory judgment that the Act: (1) is preempted by the Supremacy Clause of the United States Constitution, art. VI, cl.2, and the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA"); (2) violates Plaintiffs' rights under the NLRA, and (3) substantially and severely impairs the obligations of contracts to which Plaintiffs are parties in violation of the Contracts Clause of the Constitution, art. I, § 10, cl. 1.  In addition to a declaratory judgment that the Act is unenforceable, Plaintiffs seek an order permanently enjoining its enforcement.

### A.   The Michigan Fair and Open Competition in Governmental Construction Act

2

On July 19, 2011, Governor Snyder signed into law the Michigan Fair and Open Competition in Governmental Construction Act, 2011 Mich. Pub. Acts 98.  The Act controls the types of terms that the State or other "governmental units," such as cities, towns, counties, school districts, and others, may use in contracts for the construction, repair, or remodeling of government facilities.  The key operative provision of the Act, Section 5, states:

> A governmental unit shall not enter into or expend funds under a contract for the construction, repair, remodeling, or demolition of a facility if the contract or subcontract under the contract contains any of the following:
>
> (a) A term that requires, prohibits, encourages, or discourages bidders, contractors, or subcontractors from entering into or adhering to agreements with a collective bargaining organization relating to the construction project or other related construction projects.
>
> (b) A term that discriminates against bidders, contractors, or subcontractors based on the status as a party or nonparty to, or the willingness or refusal to enter into, an agreement with a collective bargaining organization relating to the construction project or other related construction projects.  M.C.L. § 408.875.

Section 7 of the Act prohibits the State and all governmental units from awarding a grant, tax abatement, or tax credit conditioned upon a requirement that an awardee include a term described in Section 5(a) or 5(b).  *Id.* § 408.877.  Section 9 prohibits a governmental unit, or any construction entity acting on behalf of a governmental unit, from placing any of the terms described in Section 5 in bid specifications, project agreements, or other controlling documents relating to the construction, repair, remodeling, or demolition of a facility.  *Id.* § 408.879.

Sections 11 and 13 limit the scope of the Act.  Section 11(b) states that the requirements of the Act do not "[a]pply to construction contracts executed before the effective date of this act."  M.C.L. § 408.881.  Section 13 acts as a savings clause,

3

dictating that the Act be construed so as not to interfere with rights protected under the

NLRA.  *Id.* § 408.883.  It reads:

> Sec. 13.  This act does not do either of the following:
>
> (a) Prohibit employers or other parties from entering into agreements or engaging in any other activity protected by the national labor relations act, 29 USC 151 to 169.
>
> (b) Interfere with labor relations of parties that are protected under the national labor relations act, 29 USC 151 to 169.

### B.      What is a Project Labor Agreement (PLA)?

Of particular interest is the effect the Act has upon a particular type of collective

bargaining agreement common in the construction industry, so-called project labor

agreements, or PLAs.  A PLA is a "pre-hire agreement between a construction project

owner and a union or unions that a contractor must agree to before accepting work on

the project and that establishes the terms and conditions of employment for the project."

*Johnson v. Rancho Santiago Comm. College Dist.*, 623 F.3d 1011, 1017 n. 1 (9th Cir.

2010).  It sets the terms and conditions of employment for all contractors,

subcontractors, and all construction workers who will operate at a job site for the

duration of the project.  Lynch Decl. ¶ 5.  Among the terms often included in PLAs are

no-strike clauses, grievance procedures, and resolution of jurisdictional disputes.  *Id.*

A PLA requires all contractors and subcontractors who perform work on a project

to agree to adhere to its terms.  Often, the requirement that a winning bidder on a

project agree to adhere to a PLA is incorporated directly into the bid specifications.

*See, e.g., Associated Gen. Contractors v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178,

1180 (9th Cir. 1998) ("Of course, the PLAs would not have much efficacy if they did not

4

bind the contractors and subcontractors who work on the projects. Thus, the bid specifications for the projects require all contractors and subcontractors to agree to the terms of the PLAs."). In addition, the PLA itself will usually have a term requiring all contractors and subcontractors to agree to enter into or adhere to it before beginning work. *See, e.g., Rancho Santiago*, 623 F.3d at 1117 (PLA required "that all contractors and subcontractors working on covered projects agree to the project labor agreement and to the master labor agreement negotiated by the union for each craft."). In describing the comprehensive nature of PLAs, one court opined that they "effectively unionize[] an entire construction project because all union and non-union contractors must comply with certain union protocol and procedure." *Central Iowa Bldg. and Const. Trades Council, AFL-CIO v. Branstad*, No. 11-00202, 2011 WL 4004652 at *1(S.D. Iowa, Sept. 7, 2011).

A PLA can come into effect on a given construction project through several different scenarios. *See* Lynch Decl. ¶¶ 6-9; Pls.' Suppl. Br. re: Def's Mot. to Dis., Doc. 19. In one scenario, a union building trades council (such as one of the Plaintiffs here) negotiates and enters into a PLA covering a particular project with a construction manager, who acts as agent to the owner. Then, the owner incorporates a requirement into the bid specifications that successful bidders agree to adhere to or enter into the PLA. This is the scenario described in the seminal *Boston Harbor* case. *See Bldg. and Const. Trades Council of the Metro. Dist. v. Associated Bldrs. and Contractors of Mass./R.I. Inc.*, 507 U.S. 218, 221-22 (1993) ("*Boston Harbor*"). In a related scenario, trades councils negotiate a PLA directly with an owner, who subsequently incorporates the PLA requirement into the bidding specifications. *See, e.g., Ohio St. Bldg. & Constr.*

5

*Trades Council v. Cuyahoga Cnty. Brd. of Comm'rs*, 781 N.E. 2d 951, 953 (Ohio 2002). Another possibility is that a public entity may directly negotiate a PLA with trades councils covering a series of projects over a fixed time period.  *See, e.g. Rancho Santiago*, 623 F.3d at 1016-18.  Lastly, if an owner decides to use a general contractor, the general contractor may independently negotiate a PLA with trades councils either before or after being awarded the work.

### C.      The Michigan Act's Effect on Plaintiffs' PLAs

Plaintiffs say the Act prohibits all of these scenarios.  In addition, Plaintiffs say the Act impacts their ability to enforce already-consummated PLAs on public works projects.  Plaintiffs labeled the Act the "Anti-PLA Act" in their briefs.

Plaintiffs say the Act had a direct and immediate effect on at least three PLAs they had already consummated or were in the process of negotiating.  First, the Genesee, Lapeer, Shiawassee Building and Construction Trade Council ("GLS") is party to a PLA with the Flint Mass Transportation Authority ("MTA") negotiated in early 2011.  Lynch Decl., Ex. A.  The MTA intended to use the PLA when it determined on a case-by-case basis that doing so was in its best interests.  *Id.* ¶ 11, Ex. A at p.1.  On May 24, 2011, GLS and the MTA executed the PLA for use on the construction of an alternative fueling facility.  *Id.* ¶ 11, Ex. A, p.15.  In the original bidding documents for this project, the MTA required successful bidders to agree to the terms of the PLA.  *Id.*  However, after the Act took effect on July 19, 2011, the MTA notified GLS that because of the new law, it could not use a PLA on this project.  *Id.*  The MTA eliminated the PLA requirement from the bidding documents, and the project went forward without a PLA. *Id.*

6

GLS also executed a PLA with Charles Stewart Mott Community College ("Mott") for work at the Mott campus during the term of the agreement, from January 12, 2011, to January 31, 2012, renewable on an annual basis.  Lynch Decl. ¶ 12, Ex. B. at p.9. Prior to the effective date of the Act, July 19, 2011, Mott honored the PLA by requiring all contractors and subcontractors performing covered work to agree to adhere to its terms.  *Id.* ¶ 12.  After that date, Mott informed GLS that it could no longer honor the PLA; it abandoned its practice of requiring all contractors and subcontractors to agree to adhere to its terms.  *Id.*

Plaintiffs also say that the Act affected their ability to negotiate a PLA for the Wayne County Consolidated Jail Facility Project.  In July 2011, the Wayne County Building Authority selected Walbridge - dck ("Walbridge") to serve as construction manager on this project.  Lorelli Decl. ¶ 3. The Building Authority instructed Walbridge to prepare a PLA for the project.  *Id.* ¶ 4.  Walbridge then entered into negotiations with Plaintiff the Michigan Building and Construction Trades Council for a PLA that would establish the terms and conditions of employment on the project.  *Id.* ¶ 5.  Walbridge intended to include a requirement in the bidding specifications that all successful bidders agree to adhere to the PLA.  *Id.*  However, after the effective date of the Act, the Building Authority removed the PLA requirement from its agreement with Walbridge.  *Id.* ¶ 6. Walbridge consequently informed the Trades Council that it could not negotiate a PLA for this project so long as the Act was in effect.  *Id.*

Based upon these facts, Plaintiffs allege three counts against Defendant.  Count I alleges that the Act is preempted by the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*  Count II alleges that Plaintiffs' federal rights have been violated under 42 U.S.C.

7

§ 1983.  Lastly, Count III alleges that the Act has substantially and severely impaired the obligations of contracts to which Plaintiffs are parties in violation of the Contracts Clause of the United States Constitution.

###    D.    The Parties' Arguments

Plaintiffs contend that the Act is invalid because it is tantamount to regulation; it implements a state-wide policy effectively banning PLAs on all government construction projects. Plaintiffs say that Sections 8(e) and 8(f) of the NLRA specifically authorize members of the construction industry to bargain for and enter into PLAs.  In addition, Plaintiffs say the Act renders existing PLAs to which they are party null, void and unenforceable, all in violation of the Contracts Clause of the Constitution.

Defendant says the Act is proprietary, not regulatory; it is a permissible instance of the State acting as a market participant.  Therefore, Defendant says the Act is not subject to NLRA preemption; the State is merely engaging in behavior that private parties would be free to engage in.  In addition, Defendant says that Plaintiffs mischaracterize the effect of the Act.  According to Defendant, the Act does not make PLAs illegal; rather, it compels the State and its subdivisions to ensure *neutrality* when contracting for government construction by directing public entities to neither require nor prohibit contractors from entering into an agreement with a labor organization as a condition precedent to being awarded work on State-owned or State-funded projects. Defendant says that the Act has no effect on private parties.  Lastly, Defendant says that the PLAs that Plaintiffs entered into for the MTA and Mott Community College projects are not valid contracts that could sustain a cause of action under the Contracts Clause.

III.   **STANDARD OF REVIEW**

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). When reviewing cross-motions for summary judgment, the court must assess each motion on its own merits. *Federal Ins. Co. v. Hartford Steam Boiler Insp. and Ins. Co.*, 415 F.3d 487, 493 (6th Cir. 2005)**.** "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir.2011). "[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir.2005). However, summary judgment is particularly appropriate where "the case turns upon an issue of law, such as the construction of a statute." *Salazar v. Brown*, 940 F.Supp. 160, 161 (W.D. Mich. 1996).

IV.   **ANALYSIS**

**A. Justiciability**

Defendant raised the issue of Plaintiffs' standing to maintain this suit. Standing is a threshold jurisdictional question that must be resolved in Plaintiffs' favor before the Court may proceed to the merits. *Steel Company v. Citizens for a Better Envt.*, 523 U.S. 83, 88-89 (1998).

Article III, Section 2 of the United States Constitution confines the federal courts

9

to adjudicating "cases" and "controversies."  U.S. Const.  art. III, § 2.  The existence of a case or controversy is a "bedrock requirement" for federal court jurisdiction.  *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982).  "No principle is more fundamental to the judiciary's proper role in our system of government than th[is] constitutional limitation of federal court jurisdiction . . . ."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).  Absent a case or controversy, the Court lacks jurisdiction and the case must be dismissed.  *Steel Co.*, 523 U.S. 83, 94 (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

### i.      Standing

#### 1.      Applicable Law

In order to satisfy the case-or-controversy requirement, a plaintiff must have standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.")).  "The threshold question in every federal case is whether the Court has the judicial power to entertain the suit."  *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  That is, whether, in resolving the dispute, the federal court would be acting in a manner "consistent with a system of separated powers."  *Flast v. Cohen*, 392 U.S. 83, 97 (1968).  Federal courts exist "to decide on the rights of individuals."  *Marbury v. Madison*, 5 U.S. 137, 170 (1803).  Vindicating the public interest, on the other hand, "is the function of Congress and the Chief Executive."  *Lujan*, 504 U.S. at 576.  Therefore,

the Court must be satisfied that the plaintiff has alleged "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Generalized grievances are insufficient to confer standing. *Lujan*, 504 U.S. at 573-74. Nor is an asserted right to have the government act in accordance with the law or Constitution sufficient, without more. *Allen v. Wright*, 468 U.S. 737, 754 (1984).

The "irreducible constitutional minimum" of standing requires the plaintiff to establish three elements: (1) "an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of," often referred to as traceability; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," known as redressability. *Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted).

An organization has standing to bring suit in its own name on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Com'n*, 432 U.S. 333, 343 (1977); *see also Fednav, Ltd. v. Chester*, 547 F.3d 607, 615 (6th Cir. 2008).

The party invoking federal jurisdiction has the burden to establish these elements. *Lujan*, 504 U.S. at 561 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)). Each of these elements must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In the context of a Rule

11

56 motion for summary judgment, a plaintiff cannot rely upon mere allegations of injury. *Dep't of Commerce v. United States House of Representatives*, 525 U.S. 316, 329 (1999). Rather, "a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Id.*

### 2.    No Genuine Issue of Material Fact as to Standing

In support of their motion for summary judgment, Plaintiffs submitted the declarations of Mike Lynch, President of GLS, and William Lorelli, Assistant Vice President/Project Manager at Walbridge. As set forth more fully above, pp. 6-7, the declaration of Mike Lynch establishes that GLS was party to two PLAs–one with Mott Community College, and one with the Flint MTA–both of which were nullified when the Act took effect. In addition, the declaration of William Lorelli, discussed above at p.7, establishes that the Trades Council was in the process of negotiating a PLA for work on the Wayne County Jail Project, but that the Act caused the abrupt termination of those negotiations.

Sworn declarations properly support Plaintiffs' standing allegations. *See Lujan*, 504 U.S. at 561 (holding that a plaintiff may not rely upon "mere allegations" in the context of a summary judgment motion). Defendant did not set forth any specific facts showing that there is a genuine issue of standing for trial. *See* Fed. R. Civ. P. 56(e); *Dep't of Commerce*, 525 U.S. at 330-31. The Court finds that there are no genuine issues of material fact on this issue of standing.

### 3.    The Parties' Arguments

Plaintiffs argue that they, their labor organization members, and the individual

12

employees they represent, have suffered and continue to suffer immediate and irreparable injury; and, that they have been denied their ability to engage in concerted activity specifically protected by the NLRA–including collective bargaining–in seeking to negotiate and enter into PLAs on public sector construction projects.   Plaintiffs say that their injuries can be redressed by a declaratory judgment that the Act is unenforceable; such ruling would allow them to enforce PLAs already in place on existing projects, and continue to negotiate PLAs on future projects that would otherwise be prohibited by the Act.

Defendant argues that Plaintiffs have not satisfied the case-or-controversy requirement for federal court jurisdiction.  Defendant says the Act does not impermissibly affect PLAs that are part of existing construction contracts; therefore, Plaintiffs fail to allege any injury with regard to their existing PLAs.  In addition, Defendant denies that the PLAs attached to the Lynch Declaration are even valid contracts sufficient to create a case or controversy with respect to Plaintiffs' contract clause claim.  Defendant also argues that Plaintiffs have not demonstrated a nexus between the Act and injury allegedly caused by the Act sufficient to create a case or controversy.  Defendant further states that any actions of private contractors with regard to the Act are not fairly traceable to Defendant because the Act only controls the actions of governmental units, and has no effect whatsoever on private parties.  Similarly, Defendant claims that the acts of public sector owners who terminated PLA negotiations with Plaintiffs when the Act went into effect are not traceable to Defendant because the Act does not mandate or condone such action. In short, Defendant says third parties' wrongful interpretations of the Act do not render the Act unconstitutional.  Lastly,

13

Defendant states that Plaintiffs do not state a cognizable injury because the rights they assert under the NLRA do not actually exist.

### 4.    Plaintiffs have Standing

For the reasons that follow, the Court is satisfied that Plaintiffs have standing; the Court can exercise jurisdiction over this dispute.

### a.    Injury in Fact

Plaintiffs are unincorporated associations comprised of labor organizations. Lynch Decl. ¶ 2.  The first step in deciding whether an organization has standing is to determine whether the individual members of the organization would have standing to sue in their own right.  *Hunt*, 432 U.S. at 560-61.  The complaint need not set forth the names of individual trade members in order to satisfy *Lujan's* dictate that the injury be particularized.  *See Bldg. And Constr. Trade Council of Buffalo, New York and Vicinity v. Downtown Development, Inc.*, 448 F.3d 138, 144-145 (2d Cir. 2006).

For individual members of Plaintiff organizations to have standing, they must meet the injury in fact, traceability, and redressability requirements described above. *Lujan*, 504 U.S. at 560-61.  An injury in fact must be concrete and particularized, not speculative or hypothetical.  Plaintiffs refer to the "individual employees they represent" throughout the Amended Complaint.  Plaintiffs say that these employees suffered harm as a result of the nullification of PLAs at existing construction projects, including those at Mott Community College and the Flint Mass Transit Authority.  Plaintiffs allege that their individual employees have been injured and continue to be injured by the deprivation of their right to engage in concerted protective activity, including collective bargaining, in

14

violation of the NLRA.

Purely legal injury is sufficient to confer standing if it is palpable.   *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963)**.**  Indeed, Plaintiffs have "'a legally protected interest in both negotiating and enforcing a [project labor agreement].'"  *Idaho Bldg. And Constr. Trades Council, AFL-CIO v. Wasden*, No. 11-00253, 2011 WL 6742502 at *6 (D. Idaho December 22, 2011) (citing *Bldg. And Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 172 F.Supp.2d 67, 75 (D.D.C. 2001).  Plaintiffs say that enforcement of the Act prevented them from engaging in federally protected activity.  Further, Plaintiffs say the Act has rendered contracts to which they are a party null and void.  These injuries are plainly not speculative or inchoate, and are palpable injuries in fact.

The Court is unconvinced by Defendant's argument, namely, that Plaintiffs have not met the injury in fact component of standing because the federal rights that have allegedly been violated do not exist.  Although the concepts involved in the constitutional standing doctrine are "concededly not susceptible of precise definition," *Allen*, 468 U.S. at 751, courts have repeatedly held that a palpable legal injury is sufficient to confer standing.  *See League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) (an equal protection challenge to partisan gerrymandering presents a justiciable case or controversy); *Allen,* 468 U.S. at 756 (recognizing the effects of racial discrimination as "one of the most serious injuries recognized in our legal system")*; Bantam Books*, 372 U.S. at 64 n.6 (1963)**.**  Plaintiffs allege deprivation of the right to engage in concerted activity protected by the NLRA, and that the Act substantially impairs their rights under existing contracts.  These are palpable legal

injuries sufficient to confer standing.

Defendant's contention that the rights Plaintiffs assert under the NLRA do not actually exist goes to the heart of the case and will appropriately be decided below as part of the Court's discussion of the merits.  *See Steel Co.*, 523 U.S. at 89 ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.  Rather the district court has jurisdiction if the right of the petitioners to recover under the complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.") Defendant does not assert that Plaintiffs' claims are frivolous.  That both sides provide authority arguably supporting their theory of the case does not render Plaintiffs' claims an insufficient legal injury to confer standing.

The Court now turns to the second and third of *Lujan's* standing requirements: traceability and redressability.

### b.    Traceability

The Court finds that the alleged injuries are fairly traceable to the Defendant.  As Governor of Michigan, Defendant signed the Act into law and is responsible for its enforcement.  Plaintiffs say that Section 5 of the Act operates as an across-the-board prohibition on governmental units entering into contracts with a term prohibited by the Act.  Plaintiffs further argue that the Act extends to private parties since it encompasses subcontracts under government contracts.  According to Plaintiffs, governmental units and private parties who wish to contract with the State are constrained by the Act; by its terms, they do not have discretion to enter into contracts with prohibited terms.  Thus, there are no breaks in the chain of causation between the challenged governmental

16

action and the asserted injury.  *See Wasden*, 2011 WL 6742502 at *6  ("While the chain of causation leading from enforcement of the Act against the political subdivision to the [plaintiff trade council's] injury may appear attenuated, at no point does it depend on the unfettered choices of third parties not before the Court."); *Cf. Allen*, 468 U.S. at 759. Plaintiffs' alleged injuries are directly traceable to the Act, which was signed  and enforced by the Governor.

### c.      Redressability

Lastly, Plaintiffs' injuries are redressable by a favorable ruling.  A ruling by way of the Supremacy Clause of the Constitution that the Act is preempted by the NLRA, and an injunction barring its enforcement, would allow Plaintiffs to continue negotiations with government contractors that were interrupted by the Act's passage, and would affirm the validity of existing PLAs that were allegedly rendered null and void by the Act.

### d.      Organizational Standing Requirements

Since the Court finds that the labor organization members of Plaintiffs have standing to bring suit on their own, the Court turns to the final two components of the organizational standing inquiry: are the interests the organization seeks to protect germane to its purpose; and, does the claim asserted and the relief requested require the participation of individual members in the lawsuit.

The germaneness requirement of *Hunt* is undemanding.  It requires "mere pertinence between litigation subject and organization purpose."  *Nat'l Lime Ass'n v. Envtl. Prot. Agency*, 233 F.3d 625, 636-37 (D.C. Cir. 2000).  Clearly, litigation by trades councils composed of labor unions to vindicate rights of labor organizations under the

17

NLRA, is pertinent to trades councils' organizational purposes.

Lastly, this lawsuit does not require participation of individual members of the organizations.  There are no claims for damages that would require individual proof. *See Hunt*, 432 U.S. at 344 ("[N]either the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context"); *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) ("[W]here the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the *Hunt* test may be satisfied.").

Plaintiffs have standing; they establish an injury in fact, fairly traceable to Defendant, and capable of redress by a favorable ruling.

### ii.   Ripeness

The determination of standing does not end the Court's inquiry into the case-or-controversy requirement.  The case must also be ripe for adjudication.  The ripeness inquiry concerns whether a party has brought an action prematurely; it seeks to prevent courts from entangling themselves in abstract disagreements that are not concrete enough to satisfy the constitutional and prudential requirements of the doctrine.  *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 807, 808 (2003); *Nat'l Rifle Ass'n*, 132 F.3d at 280 ("Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review.").

The Supreme Court recognizes two fundamental considerations in the ripeness analysis: (1) the "fitness of the issues for judicial decision;" and (2) "the hardship to the

18

parties of withholding court consideration." *Abbot Labs v. Gardner*, 387 U.S. 136, 149

(1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977).

The Court already determined that Plaintiffs suffered injury that is neither

speculative nor inchoate.  Critically, this case does not rest upon contingent future

events that may not occur.  Plaintiffs do not allege that they might suffer some

cognizable injury in the future; they establish facts that they have suffered, and will

continue to suffer, injury as a result of the Act's enactment.  The public interest would be

well served by a prompt resolution of the constitutionality of the Act.  *See Thomas v.*

*Union Carbide Agr. Products Co.*, 473 U.S. 568, 582 (1985).  Defendant's ripeness

argument is without merit.

This matter is ripe for an adjudication on the merits.

**B.    NLRA Preemption**

**i.    The NLRA Protects the Right of Construction Industry**
**Employees to Negotiate and Enter into PLAs**

The crux of the NLRA, Section 7, protects the right of employees to engage in

collective bargaining.  It states:

> Employees shall have the right to self-organization, to form, join, or assist labor
> organizations, to bargain collectively through representatives of their own
> choosing, and to engage in other concerted activities for the purpose of collective
> bargaining or other mutual aid or protection . . . . 29 U.S.C. § 157.

An employee's right to negotiate and secure a PLA is a form of concerted activity

protected under Section 7.

In addition, Section 8 of the NLRA explicitly allows for PLAs in the construction

industry.  In 1959, Congress passed the Landrum-Griffin Act, 29 U.S.C. §§ 158(e) and

19

(f), which amended the NLRA to add § 8(f) and modify § 8(e).  *See Boston Harbor*, 507 U.S. at 230.  Section 8(e) generally prohibits "hot cargo" agreements; that is, agreements between a union and employer which require the employer to boycott the goods or services of another party.  *See Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 654-55 (1982).  The 1959 amendment to Section 8(e) added a proviso specifically exempting the construction industry from the general prohibition of hot cargo agreements.  The proviso states: "[N]othing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work . . . ."  29 U.S.C. § 158(e).  The construction industry proviso "permits a general contractor's prehire agreement to require an employer not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that labor agreement." *Boston Harbor*, 507 U.S. at 230 (citing *Woelke*, 456 U.S. at 657).  In carving out an exception specifically targeting the construction industry, Congress recognized that exclusive subcontracting agreements were part of the pattern of collective bargaining unique to that industry, and that they should remain legal.  *Woelke,* 456 U.S. at 657.

Section 8(f) of the NLRA, added as part of the 1959 amendments, specifically authorizes prehire agreements in the construction industry.  Prehire agreements are "collective bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring or any employees."  *Boston Harbor*, 507 U.S at 230 (internal citations omitted).  Section 8(f) authorizes construction industry employers and unions to enter into agreements setting the terms and conditions of employment for workers on a specific construction project.

20

*See Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 266 (1983).

Together, Sections 8(e) and 8(f) authorize PLAs.  In requiring all contractors and subcontractors to agree to adhere to its terms, a PLA is a form of hot cargo agreement. Section 8(e) permits this type of exclusive agreement within the construction industry. Moreover, a PLA is a form of prehire agreement that sets the terms and conditions of employment for the workers hired by the employer.  As such, it is explicitly authorized by Section 8(f).  The Ohio Supreme Court succinctly summarized the relationship between the two sections: "[U]nions often seek protected Section 8(e) subcontracting clauses as part of a Section 8(f) prehire agreement."  *Cuyahoga Cnty*, 781 N.E. 2d at 956.

The PLAs between Plaintiff GLS and both Flint MTA and Mott Community College, are valid labor contracts.  As the Supreme Court noted in *Boston Harbor*, these are the "very sort of labor agreement[s] that Congress explicitly authorized and expected frequently to find."  507 U.S. at 233.

> **ii.    The Michigan Fair and Open Competition in Governmental Construction Act Effectively Forbids the Use of PLAs on State Construction Projects**

The Act expressly limits the right of private contractors or subcontractors to enter into PLAs on State construction projects.  Section 5 provides in relevant part: "[a] governmental unit shall not enter into or expend funds under a contract for . . . construction . . . if the contract or a subcontract under the contract contains . . . [a] term that requires" a PLA.  M.C.L § 408.875.  Section 9 further prohibits a "governmental unit or construction manager or other contracting entity acting on behalf of a governmental

unit" from placing a term prohibited by section 5 in any "bid specifications, project agreements, or other controlling documents related to the construction . . . ." *Id.* § 408.879.

By its terms, the Act's prohibitions extend beyond preventing governmental units from themselves entering into PLAs.  The Act affects private contractors and subcontractors too, and prevents them from entering into PLAs on governmental construction projects in two ways: First, Section 9 prevents the State or local units of government from implementing PLAs negotiated by private parties by taking the necessary step of incorporating the PLAs into the bid specifications; and second, Section 5 effectively prohibits the voluntary use of PLAs on government construction projects by prohibiting the State and local units of government from entering into or expending funds under a contract if a subcontract under the contract contains a term prohibited by Section 5.  As explained above, a PLA, in order to be effective, requires all contractors or subcontractors to agree to its terms.  A PLA, therefore, necessarily contains a term prohibited by Section 5 of the Act.  PLAs are prohibited on all governmental construction projects because the State is prohibited from even "expending funds" under a contract if a contract or subcontract under the contract contains a requirement that all contractors or subcontractors adhere to its terms.

By way of illustration, consider the following scenario, discussed by the parties at oral argument:  The State or a local unit of government enters into an agreement with a general contractor without regard to whether the general contractor plans to use a PLA on the particular construction project.  The general contractor later decides to enter into a PLA with a labor organization that requires all subcontractors on the project to agree

22

to adhere to its terms.  The Act prohibits this scenario, even though it is not a situation in which the State itself enters into a PLA.  Section 5 prohibits the State from *expending funds* under a contract if the contract or a *subcontract under the contract* contains a PLA requirement.  Here, a subcontract under the contract contains a PLA requirement; thus, the State could not pay the general contractor or the subcontractors without being in violation of the Act.

Defendant argues that reading the Act to restrict the private conduct described in the previous paragraph is inconsistent with Section 13's directive that the Act shall not be construed so as to interfere with agreements or other activity protected by the NLRA. *See* M.C.L. § 408.883.  The Court, however, believes there is no way to harmonize Section 13 with the other sections of the Act, without rendering the entire Act meaningless.  *See* Part IV.B.iv, *infra*.  Therefore, Section 13 does not affect the above analysis.

Defendant has consistently argued that the Act has no effect on private parties. He says that a private contractor or subcontractor may successfully bid on a government project and then enter into a PLA without running afoul of the Act. Likewise, Defendant says a private contractor or subcontractor; already party to a PLA, may bid on a governmental construction project.  All that the Act requires, according to Defendant, is that governmental units remain *neutral* with respect to PLAs; a governmental unit may neither require nor prohibit a PLA as a condition precedent for awarding work on a project.

Defendant's interpretation of Section 5 is belied by the plain language of the statute.  The Court finds there is no way to read the Act as Governor Snyder does: as

23

permitting PLAs on government construction projects so long as the State remains labor neutral during the bidding process.  Section 5 of the Act operates as a flat prohibition on the State from entering into construction contracts which contain the subcontracting language expressly protected by Section 8(e) of the NLRA.  Section 5 says nothing of bid specifications, or neutrality in bidding; it plainly states that a governmental unit may not *enter into* or *expend funds under* a contract that contains a PLA requirement.  By its plain language, the Act prohibits the "very sort of labor agreement that Congress explicitly authorized."  *Boston Harbor*, 507 U.S. at 233.

Undeniably, there is some tension between the Act and the NLRA.  Accordingly, the Court must determine whether the Act is preempted under either of the Supreme Court's NLRA preemption doctrines–*Garmon* and *Machinists*–and, if so, whether the Act is tantamount to regulation or constitutes permissible proprietary conduct by the State.

### iii.   The Act is Preempted Under the *Garmon* and *Machinists* Preemption Doctrines

In passing the NLRA, Congress largely displaced state regulation of industrial relations.  *Wisc. Dept. of Ind., Labor, and Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986).  Though the NLRA contains no express preemption provision, "[t]he Court has articulated two distinct NLRA pre-emption principles," *Garmon* preemption and *Machinists* preemption.  *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 748 (1985).  The two preemption doctrines are concerned with preventing a "state or federal official or government entity [from] alter[ing] the delicate balance of bargaining and economic power that the NLRA establishes, whatever his or its purpose may be."

24

*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1337 (D.C. Cir. 1996).

### 1.    *Garmon* Preemption

*Garmon* preemption prohibits the state and local units of government from regulating activities that are "protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 244 (1959) ("*Garmon*"). The scope of *Garmon* preemption extends to regulation of activities that the NLRA only *arguably* protects or prohibits. *Boston Harbor*, 507 U.S. at 225 (citing *Gould*, 475 U.S. at 286). *Garmon* preemption exists "to preclude state interference with the [NLRA's] interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 613 (1986) ("*Golden State I*"). The *Garmon* Court explained that "[t]o leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. *Garmon*, 359 U.S. at 244.

As discussed above, Section 7 of the NLRA protects the rights of employees to engage in concerted activity for the purposes of collective bargaining. The ability to negotiate and enter into PLAs is a form of concerted activity protected under Section 7. Indeed, Sections 8(e) and 8(f) of the NLRA explicitly authorize construction industry employees to enter into PLAs. *See* Section IV.B.i., *supra.*

The Michigan Fair and Open Competition in Governmental Construction Act prevents workers from exercising their right to engage in concerted activity for the

25

purpose of convincing State or local units of government to enter into a PLA.  The Act effectively bans PLAs on State construction projects by prohibiting the State from entering into a PLA or expending funds on a contract if the contract or subcontract under the contract contains a PLA requirement.  M.C.L § 408.875.  Additionally, Section 9 prohibits a governmental unit from ever including a PLA requirement in bid specifications, a necessary step for implementing a PLA where a union trades council is negotiating directly with the state or a construction manager as agent for the state, rather than with a general contractor.  *Id.* § 408.879.

Defendant argues that the Act is not preempted because the NLRA does not create rights enforceable against governmental units.  Section 2 of the NLRA exempts the States from the definition of "employer."  29 U.S.C. § 152(2).  Yet, the Supreme Court has held that the NLRA "confers certain rights 'generally on employees and not merely as against the employer.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108 (1989) ("*Golden State II*") (quoting *Hill v. Florida*, 325 U.S. 538, 546 (1945)).  In *Golden State II*, the Court held that a city can be held liable under 42 U.S.C. § 1983 for violations of the NLRA.  The Court stated that "[t]he NLRA . . . creates rights in labor and management both against one another and against the State."  *Id.* at 109.  Consistent with this principle, the Supreme Court stated in *Boston Harbor* that although the State is excluded from the definition of "employer," "[n]evertheless, the general goals behind the passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by these sections."  507 U.S at 229.  The Court concluded that "Section 8(f) and the construction-industry proviso to Section 8(e) are clear manifestations of

26

Congress's intent to preclude the states from regulating PLAs in the construction industry. *Id; see also Wasden*, 2011 WL 6742502 at *12 ("[I]t does not matter if the Act only purports to regulate political subdivisions if it also blocks employees from engaging in concerted activity protected under the NLRA.").

The Act, therefore, is an impermissible obstacle to the right to bargain for PLAs on State construction projects. It directly conflicts with the principle announced in *Garmon*, namely, "that States may not regulate activity that the NLRA protects . . . ." *Gould*, 475 U.S. at 286 (citing *Garmon*, 359 U.S. at 236). Because the NLRA and the Act "cannot move freely within the orbits of their respective purposes without impinging upon one another," the Act is preempted. *See Hill*, 325 U.S. at 543.

### 2. *Machinists* Preemption

*Machinists* preemption prohibits state and local regulation of areas that Congress intended to be left "unregulated and to be controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Empl. Relations Comm'n*, 427 U.S. 132, 140 (1976) ("*Machinists*"). It "creates a free zone from which all regulation . . . is excluded." *Golden State II*, 493 U.S. at 111. The purpose of this line of preemption is to "preserve[] Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." *Boston Harbor*, 507 U.S. at 226 (internal quotations and citations omitted). The crucial inquiry for *Machinists* preemption is whether Congress intended that the conduct involved be unregulated and controlled by the free play of economic forces. *Machinists,* 427 U.S. at 140 (citing *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971)).

27

*Machinists* preemption was initially invoked to prohibit the states from imposing additional restrictions on economic weapons such as strikes or lockouts.  *See, e.g. Golden State I*, 475 U.S. at 614-15.  The idea is that if states could prohibit strikes or other economic weapons, they would "upset the balance that Congress has struck between labor and management in the collective-bargaining relationship."  *Chamber of Commerce of the United States v. Lock*yer, 463 F.3d 1076, 1086 (9th Cir. 2006).  Recently, *Machinists* preemption "has been used . . . to determine the validity of state rules of general application that affect the right to bargain or to self-organization."  *Metropolitan Life. Ins. Co. v. Massachusetts*, 471 U.S. 724, 749 n. 27 (1985).

By enacting the 1959 Amendments to the NLRA, which amended Section 8(e) to add the construction industry proviso and added Section 8(f) to allow for prehire agreements, Congress established the balance of power within which construction industry employers and unions could bargain.  By specifically authorizing certain kinds of PLAs in the construction industry that the NLRA does not permit in other industries, "Congress intended to accommodate conditions specific to that industry . . . [including] the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a long-standing custom of prehire bargaining in the industry."  *Boston Harbor*, 507 U.S. at 231.   By addressing construction industry PLAs directly and establishing a slightly different balance of power for bargaining within that industry, Congress' intent to leave construction industry PLAs to the operation of economic forces is clear.  The Court here is not asked to interpret Congressional silence; Sections 8(e) and (f) manifest Congress' directive with respect to construction industry PLAs.  Any attempt by

28

the state to upset this clearly established balance of power would be preempted under *Machinists*.

The Michigan Fair and Open Competition in Governmental Construction Act upsets the balance of power Congress struck between unions and employers in the construction industry.  The Act has the effect of prohibiting PLAs on all construction projects by the State and its subdivisions, despite the fact that Congress intended PLAs to be permissible.  In addition, it takes away the discretion that State and local units of government formerly had to determine whether the use of a PLA was in their best interest on any given project.  The Supreme Court in *Boston Harbor* suggested that this very scenario would be preempted under *Machinists*: "Indeed, there is some force to [the] argument . . . that denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists*."  *Boston Harbor*, 507 U.S. at 232.

Because the Act upsets the balance of power Congress established with respect to the use of PLAs in the construction industry, it conflicts with the NLRA and is preempted by *Machinists*.

### iv.    Section 13 Does Not Save the Act from Preemption

Defendant says that the Act is saved from preemption by the limiting provisions of Section 13.  Section 13 states:

Sec. 13.  This act does not do either of the following:

(a) Prohibit employers or other parties from entering into agreements or engaging in any other activity protected by the national labor relations act, 29 USC 151 to 169.

(b) Interfere with labor relations of parties that are protected under the national

labor relations act, 29 USC 151 to 169.

Defendant admits that the right of a private contractor to enter into a PLA is protected under the NLRA.  Def. Sec. Sup. Br., Doc. 21 at 1.  But, Defendant says that everything in the Act must be construed consistent with the requirements of Section 13.  Therefore, Defendant says that Section 5 or any other part of the Act can not be construed so as to interfere with the right of private contractors or subcontractors to enter into PLAs when working on a government project.

Application of Section 13 does not render the entire Act meaningless.  First, the Court cannot conceive of any way Section 5 can be interpreted so as not to run afoul of the NLRA.  The plain language of Section 5 prevents the State from entering into or expending funds on a contract if the contract or a subcontract under the contract contains a PLA requirement.  Defendant's interpretation–that Section 5 merely requires neutrality as to PLAs in bid specifications–is completely unsupported by the text of the statute.  These prohibitions necessarily affect private conduct that is protected by the NLRA.  Therefore, construing Section 5 with Section 13 effectively reads Section 5 out of the statute.

Even if the Court were to accept Defendant's reading of Section 5 and find that that section can be construed so as not to affect the rights of private parties to enter into PLAs, the statute still violates rights protected under the NLRA.  This is because Section 7 of the NLRA protects the rights of union members to engage in concerted activity by seeking to encourage governmental entities to enter into PLAs.  *See* Section IV.B.iii.1, *supra*.  Defendant has consistently refused to acknowledge that this right is protected by the NLRA, arguing that the NLRA is not enforceable against the

30

government because the government is excluded from the definition of "employers."  As discussed above, this argument is wrong.  Every section of the Michigan Act affects the right of union members to engage in concerted activity directed at the State and its subdivisions.

There is no way to give meaning to Section 13 without rendering the entire Act a nullity; therefore, Section 13 does not save the Act from preemption.  For these same reasons, the Court does not believe severing any portions of the Act would save it from preemption.  The Court finds that the entire Act is preempted, not merely Section 5.

### v.      The Act is Tantamount to Regulation

The Court now turns to the final, and decisive, issue in the preemption analysis: whether the Act is tantamount to regulation or amounts to permissible proprietary conduct by the State.

### 1.      The Distinction Between Regulation and State Proprietary Conduct

The law recognizes a distinction between regulation and actions a state takes in a proprietary capacity to serve its own needs as a market participant.  Regulation is subject to NLRA preemption; proprietary conduct is not.  *Boston Harbor*, 507 U.S. at 227 ("We have consistently held that the NLRA was intended to supplant state labor *regulation*, not all legitimate state activity that affects labor.")  Thus, to say that the NLRA preempts state law means only that the NLRA preempts a State from regulating within the protected zone.  *Id.* at 226-27.  The State still may act within the protected zone as a market participant.  *Id.* at 227.  The *Boston Harbor* Court explained: "When a State owns and manages property, for example, it must interact with private participants

31

in the marketplace.  In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*."  *Id.*

Two Supreme Court cases establish the test for the market participant doctrine: *Gould*, 475 U.S. 282 (1986), and *Boston Harbor*, 507 U.S. 218 (1993).  In *Gould*, the Court held that a Wisconsin statute debarring repeat violators of the NLRA from doing business within the state was preempted by the NLRA.  Wisconsin conceded that the point of the statute was to deter labor law violations, but argued that it escaped NLRA preemption because it represented an exercise of the state's spending power rather than regulatory power.  The Court disagreed, stating: "Because Wisconsin's debarment law functions unambiguously as a supplemental sanction for violations of the NLRA, it conflicts with the Board's comprehensive regulation of industrial relations . . . ." 475 U.S. at 288.  The Court found that the statute "serves plainly as a means of enforcing the NLRA."  *Id.* at 287.  The Court concluded "that by flatly prohibiting state purchases from repeat labor law violators Wisconsin simply is not functioning as a private purchaser of services; for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation."  *Id.* at 289.

The Supreme Court further refined the market participant doctrine in *Boston Harbor*.  In that case, the Court held that the NLRA did not preempt a state agency's bid specifications that required any contractor working on the state-sponsored cleanup of Boston Harbor to agree to adhere to the terms of a PLA.  The Court distinguished *Gould*, noting that "the statute at issue in *Gould* addressed employer conduct unrelated to the employer's performance of contractual obligations to the state." 507 U.S. at 229.  By contrast, the Boston Harbor agency was acting as a proprietor because "there is no

32

question that [it] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost," and that "the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project." *Id.* at 332.

In discussing the conceptual distinction between proprietary and regulatory conduct, the Court noted that a private party can engage in regulatory behavior, even though its conduct is not subject to NLRA preemption.  "A private actor, for example, can participate in a boycott of a supplier on the basis of a labor policy concern rather than a profit motive.  The private actor under such circumstances would be attempting to 'regulate' the suppliers and would not be acting as a typical proprietor."  *Id.* at 229. Therefore, it is not correct to say that a state's conduct is necessarily proprietary simply because it is permissible for a private party to engage in the same conduct.

*Gould* and *Boston Harbor*, taken together, hold that a court must look at two factors to determine whether state action constitutes market participation: (1) whether the action furthers a state's interest in efficient procurement of goods or services, or addresses conduct unrelated to that interest; and (2) whether the action seeks to set a broad policy in the state, or is sufficiently narrow to foreclose that inference.

The most recent Supreme Court case to address the market participation doctrine, *Chamber of Commerce of the United States v. Brown*, 554 U.S. 60 (2008), confirmed that both prongs are relevant to the inquiry.  In holding that a California statute which prohibited certain employers which receive state funds to use those funds to "assist, promote, or deter union organizing" was preempted by the NLRA, the Court observed: "It is beyond dispute that California enacted [the statute] in its capacity as a

33

regulator rather than a market participant. [The statute] is neither 'specifically tailored to one particular job' nor a 'legitimate response to state procurement constraints or to local economic needs.'" 554 U.S. at 70 (quoting *Gould*, 475 U.S. at 291).

Although the Sixth Circuit does not appear to have addressed the issue, the Fifth Circuit distilled *Gould* and *Boston Harbor* into a two-part test:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

*Cardinal Towing & Auto Repair Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999). Other Circuits adopted this test. *See Rancho Santiago*, 623 F.3d at 1023-23; *Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87, 109 (2d Cir 2006); *Hotel Employees and Restaurant Employees Union, Local 57 v. Sage*, 390 F.3d 206, 216 (3d Cir. 2005).

## 2.   The Michigan Act is Regulatory

The Court holds that the Michigan Act is regulatory. It is not narrowly tailored to a specific project or projects, or to a specific time frame, but is an across the board ban on PLAs on all public works projects initiated by the State or its political subdivisions. In addition, the Act does not reflect the State's interest in the efficient procurement of goods and services. Without making any findings that PLAs raise construction costs, the Michigan Legislature decided to prohibit governmental units from exercising their discretion on a case-by-case basis to decide whether a PLA furthers the State's economic interests. Such a rigid, unbending policy smacks of regulation. Under the

guise of exercising its spending power, the State chose sides on a matter of labor policy.  This kind of conduct is clearly "tantamount to regulation" and subject to NLRA preemption.

### a.    The Michigan Act is Not Narrowly Tailored

First, the broad scope of the Act raises an inference of policy-making.  It applies to all public works projects by Michigan or its subdivisions, without geographic, temporal, or other restraints.  The Ninth Circuit recently explained when state action is sufficiently narrow in scope to satisfy the second prong of the *Cardinal Towing* test. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 398, 399 (9th Cir. 2011) It stated that the prong is satisfied by "narrow spending decisions[, which] tend to be expressly limited in time and scope – for example, they apply to one city contract or to a number of contracts of a particular size and funded by a particular finite source."  *Id.* Applying this principle, a district court in Idaho recently held that a state statute banning PLAs on all public works projects was not sufficiently narrow to satisfy the second prong of *Cardinal Towing.  Wasden*, 2011 WL 6742502 at *9 ([T"]he [act] applies to all public works projects—it is not limited to projects of a particular size, a particular time period, or a particular funding source. These factors indicate that the Act does not fall within the narrow scope prong.").

The Court is aware of only one other appellate decision upholding an across the board rule governing PLAs on government projects, the *Allbaugh* case, discussed below.  *See Bldg. and Constr. Trades Dept., AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).  In every other case that escaped preemption analysis, the challenged state action was far more focused.  In ruling the state agency's conduct proprietary, the

*Boston Harbor* Court relied on the fact the PLA it entered into was "specifically tailored to one particular job."  507 U.S. at 232.  Other courts recognize that the narrow scope of the project in *Boston Harbor* was critical to the Supreme Court's finding of proprietary rather than regulatory conduct.  *See, e.g., Rancho Santiago*, 623 F.2d at 1028-29 (PLA covering campus improvement projects at a community college for a three-year period deemed proprietary); *Sage*, 390 F.3d at 217 (conditions on bonds issued by city agency for construction in a particular redevelopment zone deemed proprietary); *Colfax Corp. v. Illinois State Toll Hwy. Auth.*, 79 F.3d 631, 634 (7th Cir. 1996) (multi-project PLA deemed proprietary and more akin to the job-specific agreement of *Boston Harbor* because "Illinois has not passed . . . a general rule.")

In *Allbaugh*, however, the D.C. Circuit upheld a blanket rule in an Executive Order that barred all federal agencies and any entity receiving federal assistance for a construction project from requiring or forbidding bidders or contractors from entering into a PLA.  295 F.3d 28.  The Court held that the use of a blanket rule made no difference.  *Id.* at 34.  The only relevant consideration in the market participation inquiry, according to *Allbaugh*, is whether in placing a labor-related condition in an award of work, the government "seeks to affect conduct unrelated to the employer's performance of contractual obligations to the Government."  *Id.* at 34 (internal quotations and citations omitted).

The Court believes *Allbaugh*'s holding is simply incompatible with the Supreme Court's holdings in *Gould*, *Boston Harbor*, and *Brown*.  All three of these cases indicate that the scope of the governmental action is a relevant factor to consider in the market participation inquiry.  Even *Gould*–most commonly cited for the proposition that state

36

action is regulatory when it addresses employer conducted unrelated to the employer's

contractual obligations to the state, the first of the *Cardinal Towing* prongs–appears to

have taken into account the broad scope of the Wisconsin statute in finding it regulatory.

The Court stated: "[B]y *flatly prohibiting state purchases* from repeat labor law violators

Wisconsin simply is not functioning as a private purchaser of services" (emphasis

added). 475 U.S. at 289. *Boston Harbor* noted that the PLA there was tailored to one

particular job. Lastly, in *Brown*, although the market participation doctrine does not

appear to have been at issue, the Court declared that a California statute was

regulatory because it was not "specifically tailored to one particular job." 554 U.S. 70.

*Allbaugh*'s holding that the scope of the governmental action is irrelevant flies in the

face of the three Supreme Court cases which discuss market participation.

*Allbaugh's* holding rests on a fundamental misreading of *Boston Harbor*.

*Allbaugh* read *Boston Harbor* to mean that if a state acts in a manner that would be

permissible for a private party, the conduct is proprietary. 295 F.3d at 34. The court

then reasoned that because private parties are free to boycott contractors who require

PLAs without running afoul of the NLRA, so, too, are the states. Yet, *Boston Harbor*

explicitly states that private parties can engage in regulatory behavior. The Supreme

Court stated: "A private actor, for example, can participate in a boycott of a supplier on

the basis of a labor policy concern rather than a profit motive. The private actor under

such circumstances would be attempting to 'regulate' the suppliers and would not be

acting as a typical proprietor." 507 U.S. at 229. It follows logically that just because a

state engages in behavior that would be permissible for a private party does not mean

that such conduct is proprietary rather than regulatory. The Ohio Supreme Court

competently described the fallacy of *Allbaugh*'s reasoning:

> This reasoning, we believe, places the proverbial cart before the horse. These courts assume that a state acts as a market participant by doing what a private actor may do under the NLRA. But the gist of *Boston Harbor* is that a state may act as a private contractor would act *when it acts as a market participant*. Otherwise, the state would be permitted to regulate within a protected zone because a private actor may do so.

*Cuyahoga Cnty*, 781 N.E.2d at 968-69.

Moreover, *Allbaugh* is bookended by a pair of cases within the D.C. Circuit that do not follow its holding. In *Reich*, the D.C. Circuit held that an Executive Order authorizing the Secretary of Labor to disqualify employers who hire permanent replacement workers during a lawful strike from certain federal contracts was preempted by the NLRA. In reaching its conclusion, the Court compared the "far-reaching" scope of the Executive Order–which applied to all federal contracts over $100,000, a dollar amount equivalent to 6.5% of the gross domestic product–with the narrowly tailored PLA in *Boston Harbor* that applied to a single project. In a case decided after *Allbaugh*, *UAW-Labor Employment and Training Corp. v. Chao*, 325 F.3d 360, 363 (D.C. Cir. 2003), the D.C. Circuit stated that an executive order was "regulatory under prevailing principles" because it "operates on government procurement across the board, rather than being tailored to any particular setting." *Id.* Thus, it appears *Allbaugh's* holding that the scope of state action is irrelevant to the market participation inquiry is of questionable authority even within the D.C. Circuit, and the Court need not follow it here.

        **b.**     **The Michigan Act Does Not Reflect the State's Interest in Efficient Procurement of Goods and Services**

38

Having found that the scope of the Michigan Act is not so narrowly tailored as to defeat an inference that it's primary goal was to implement labor law, the Court turns to the first prong of the *Cardinal Towing* inquiry: "does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?" 180 F.3d at 693. The Court holds that the Act does not reflect the State's own interest in the efficient procurement of goods or services, as measured by comparison with the typical behavior of private parties; rather, it "seeks to set a broad policy" under the guise of neutrality. *See Reich*, 74 F.3d at 1337.

On its face, the Act says nothing about the State's interest in efficient procurement of goods and services. The Preamble states: "AN ACT to provide for fair and open competition in governmental construction contracts . . . ." It is instructive to compare this language with the executive order in *Allbaugh*. There, the stated purpose of the order was to promote "the economical, nondiscriminatory, and efficient administration and completion of Federal and federally-funded or assisted projects. . . ." 66 Fed. Reg. at 11,225. The preamble to the Michigan Act is much more ambiguous.

"Fair and open competition" is not synonymous with efficient and economical. Merriam-Webster's online dictionary defines fair as "marked by impartiality and honesty: free from self-interest, prejudice, and favoritism." Deciding what is "fair" necessarily involves a balancing of competing interests; it is not self-evident. It is a classic policy decision. The problem with the Michigan Legislature's attempt to impose its own definition of fairness on labor relations is that Congress already decided what the proper balance of power should be between unions and employers when it amended the NLRA

39

in 1959 to add the construction industry proviso to Section 8(e), and added Section 8(f).
*See* Part IV.B.i., *supra*. Here, "fairness" is a disguised way for the State to upset the
balance of power established by Congress. But, in order to prevent "further
balkanization of federal labor policy," "[n]o state or federal official . . . can alter the
delicate balance of bargaining power that the NLRA establishes, whatever his or its
purpose may be." *Reich*, 74 F.3d at 1337, 1338.

Moreover, the Michigan Legislature made no findings that the use of PLAs on
State construction projects increases costs. Although not an official statement of
legislative intent, an analysis of the Act "prepared by nonpartisan House staff for use by
House members in their deliberations" determined that the fiscal impact of the Act was
"indeterminate," and that research on the cost impact of PLAs generally "is decidedly
mixed" (Doc. 12 Ex. 2). The fact that the Legislature was unaware of any cost savings
the Act would bring strengthens the inference that it was motivated by concerns for
labor policy.

The Senate Record cited by Defendant does not change this analysis. In support
of the Act, Senator Colbeck stated: "We need to stop interfering with this free market,
and we need to stop picking winners and losers in the assignment and appropriation of
taxpayer funds." State of Michigan, Journal of the Senate, 96th Legislature, Regular
Session of 2001, p. 1498. Senator Moolenaar stated, also in support of the Act: "[PLAs]
will still exist. They just won't be able to discriminate anymore." *Id.* Ending perceived
"discrimination" or perceived choosing of "winners and losers" smacks of policy.
However, the Court notes that the subjective intent of the legislature is not necessary to
a finding that the Act is regulatory, and it does not affect this Court's conclusion. *See*

40

*Rancho Santiago*, 623 F.3d at 1026 ("[W]e are quite certain that Congress did not intend for the NLRA's . . . preemptive scope to turn on a state official's subjective reasons for adopting a regulation or agreement.").

Even if the Michigan Act on its face did purport to further the State's interest in the efficient procurement of goods and services, or if the Michigan Legislature subjectively believed the Act would lower costs, the Act still would not satisfy the first prong of *Cardinal Towing* because the State is not acting in the typical manner of private parties under like circumstances.

The Supreme Court made clear in *Boston Harbor* that the use of a blanket rule is not the action of a typical proprietor. The Court noted that a private actor is free to engage in a boycott of a supplier on the basis of labor policy without running afoul of the NLRA, but it further stated that the private actor "under such circumstances would be attempting to 'regulate' the suppliers and *would not be acting as a typical proprietor*" (emphasis added). 507 U.S. at 229. The Court recognized that taking a stand for or against something, merely on principle, is not rationally motivated by economic concerns and is therefore not typical of private actors in the marketplace. Therefore, where the state acts in a manner that is not typical of private parties under similar circumstances–as Michigan has done here–courts can conclude that the state is attempting to implement policy. No private party would have entered into an agreement boycotting PLAs without first concluding that it would be economically beneficial. That Michigan did just that demonstrates that it acted to affect labor policy.

The Act fails both prongs of the market participation test set forth in *Boston Harbor*. It is not narrowly tailored, and it affects private conduct unrelated to the State's

41

efficient procurement of goods or services.  It is regulatory and subject to NLRA
preemption.

### vi.    Conclusion of NLRA Preemption Analysis

For these reasons, the Michigan Act is preempted under the NLRA.  Likewise,
the Court finds that Plaintiffs rights were violated.  Plaintiffs prevail on their claim under
42 U.S.C. § 1983.

### C.    Plaintiffs' Contracts Clause Claim

Plaintiffs' third cause of action states that the Act violates the Contracts Clause of
the Constitution by rendering PLAs to which they are parties null and void.  The parties
barely touched upon the Contracts Clause claim in their briefs and at oral argument.
Plaintiffs provide no cases in which impairment of an existing PLA was held to be a
violation of the Contracts Clause, and the Court is not aware of any.

Although a collective bargaining agreement is a valid contract sufficient to
support a cause of action under the Contracts Clause, *see, e.g., Toledo Area AFL-CIO
Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998), the nature of PLAs greatly
complicates the issue.  As explained above, a PLA operates prospectively to require all
future successful bidders on a construction project to agree to adhere to its terms.  Yet,
the Contracts Clause is concerned with a state *retroactively* impairing preexisting
contracts through its legislative authority.  *See Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234, 240-42 (1978).

The Court is unsure whether it can reconcile the forward-looking nature of PLAs
with the retrospective nature of a Contracts Clause violation.  It does not appear that

any other court has addressed this issue.  But, because the Court found that the Act is preempted by the NLRA, it need not reach Plaintiffs' Contracts Clause claim.

## V.  CONCLUSION

The Michigan Fair and Open Competition in Governmental Construction Act impermissibly interferes with the comprehensive regulatory scheme established by the NLRA.  It is preempted.  Accordingly, Plaintiffs' rights were violated under 42 U.S.C. § 1983.  The Court expresses no opinion on Plaintiffs' Contracts Clause claim.

Plaintiffs' motion for summary judgment is **GRANTED**.  Defendant's motion for summary judgment is **DENIED.**  Judgment enters for Plaintiffs.  The Court permanently enjoins enforcement of the Michigan Act, 2011 Mich. Pub. Acts 98, M.C.L. § 408.871, *et seq.*

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  February 29, 2012

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 29, 2012.

S/Linda Vertriest
Deputy Clerk